# AUSTIN et ux,
## *Appellants,*
### *v.*
# DANFORD et ux,
## *Respondents.*

## (80-1087-L; CA A23441)

660 P2d 698

Carlyle F. Stout, III, Medford, argued the cause for appellants. With him on the brief was Grant, Ferguson & Carter, Medford.

James H. Smith, Medford, argued the cause for respondents. With him on the brief was Grantland, Smith & Grensky, Medford.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

### WARREN, J.

Plaintiffs (tenants) brought an action against defendants (landlords) under the Residential Landlord and Tenant Act. ORS 91.700 to 91.895. Tenants alleged that landlords (1) failed to maintain the rented premises in a habitable condition, (2) deliberately refused or were grossly negligent in failing to provide an essential service and (3) engaged in retaliatory conduct by threatening to bring an action to evict tenants. The trial court entered judgment for landlords. We affirm.

On February 1, 1980, tenants began renting a mobile home located in a rural area under an oral agreement with landlords. Rent was set at $250 per month until June 1, 1980, when it was to be $260. The primary water supply for the trailer was water diverted from a creek on the premises and stored in a cistern. The safety of the water and landlords' willingness to provide another water source form the factual background of this action.

On June 24, 1980, tenants took a water sample from the kitchen faucet to the Medford Laboratories. The lab reported to tenants that the water was unsafe for drinking. On June 28, tenants sent landlords a copy of the report and a letter that stated, in part:

> "We got the water test sample back, and as you can see it is contaminated. I don't know what to do about it but I think I would like to discuss it w/you. I'm going to have water up here for us to drink. I don't know if the ten dollar a month increase in our rent is justified under these circumstances. * * *"

The parties discussed the water problem on July 26. Landlords offered to have bottled water delivered to the trailer for drinking, but tenants said that that would be an invasion of their privacy. Tenants wanted to haul the water themselves and requested a rent reduction to $225 per month. Landlords said that a $35 per month reduction was excessive, because they could hire someone to haul water for much less, but they agreed to a temporary reduction to end the stalemate. Landlords requested that tenants have the water tested again to determine the extent and source of the contamination. Landlords agreed to pay for the tests.

On August 16, landlords orally notified tenants that the rent would be $250 per month. Landlords believed that the $10 per month reduction from the originally agreed on rent of $260 represented the reasonable cost of having bottled water delivered to the premises for drinking. On August 23, landlords received a letter from tenants in which they stated that a rent increase notice must be in writing and that if landlords did not believe $225 per month was fair, they should initiate a lawsuit.

On August 29, landlords delivered written notice to tenants that the rent would be $250 per month. Tenants informed landlords of the second water test, which showed that the water from the creek was unsafe for drinking. Landlords again offered to have either a water company or a friend deliver bottled water to the trailer. Tenants rejected the offer, because they did not want to depend on a friend of landlords' and because they believed, incorrectly, that no water company would deliver bottled water to the trailer. Tenants offered temporarily to haul their own water if the rent remained at $225. They stated that they did not want to move but did want the water system repaired.

On September 16, landlords notified tenants that their tenancy would terminate on October 20, 1980. Landlords testified that they terminated the tenancy because of the breakdown of their previously friendly relationship with tenants and because they wanted to evaluate whether the water system was acceptable for rental purposes and to make necessary changes. Tenants continued to haul their own water and to pay $225 per month in rent until they moved out January 15, 1981.

Tenants raise four assignments of error. They contend first that the trial court erred in holding that the Residential Landlord and Tenant Act did not apply to these landlords. Tenants point to the following statement by the court in its oral opinion:

"* * * I also am taking into consideration he is not an expert—not a professional landlord. From what I gather, this is probably his first venture into being a landlord. I think that that has some effect upon the Uniform Landlord and Tenant Act. I think that this is designed basically for professional landlords. * * *"

Although this statement taken on its own implies that the court did not apply the act, other parts of the opinion show clearly that it did. The court concluded that tenants failed to prove that landlords had violated the act.

Tenants next contend that the trial court erred in deciding that landlords maintained the trailer in a habitable condition. ORS 91.770(1) provides, in part:

"A landlord shall at all times during the tenancy maintain the dwelling unit in a habitable condition. For purposes of this section, a dwelling unit shall be considered unhabitable if it substantially lacks:

"* * * * *

"(c) A water supply approved under applicable law, which is:

"(A) Under the control of the tenant or landlord and is capable of producing hot and cold running water;

"(B) Furnished to appropriate fixtures; * * *

"* * * * *"

Tenants argue that landlords violated this statute in three respects. First, the water supply was not "approved under applicable law," because landlords did not have a permit to divert water from the creek as required by ORS 537.130.[1] Second, the water from the creek did not satisfy ORS 91.770(1)(c), because the legislature must have intended that the water be drinkable. Third, bottled water was insufficient, because it was not "capable of producing hot and cold running water" and was not "furnished to appropriate fixtures."

None of these issues are specifically addressed in ORS 91.770(1); therefore, we must determine the manner in which the legislature intended the statute to resolve

---

[1] ORS 537.130 provides:

"(1) Any person intending to acquire the right to the beneficial use of any waters shall, before commencing the construction, enlargement or extension of any ditch, canal or other distributing or controlling works, or performing any work in connection with the construction, or proposed appropriation, make an application to the Water Resources Director for a permit to make such appropriation.

"(2) No person shall use, store or divert any waters until after the issuance of a permit to appropriate such waters."

them. Several principles of statutory construction guide our determination. "The starting point in every case involving a determination of legislative intent is the language of the statute itself." *Whipple v. Howser,* 291 Or 475, 479, 632 P2d 782 (1981). Further, a statute must be construed as a whole, and effect must be given to the overall policy which the statute was intended to accomplish. *Tatum v. Clackamas County,* 19 Or App 770, 775, 529 P2d 393 (1974), *overruled on other grounds, Allison v. Washington County,* 24 Or App 571, 548 P2d 188 (1975).

■    Applying these principles here, we decide that ORS 537.130, which requires landlords to obtain a permit to divert water from the stream, is not an "applicable law" within the meaning of ORS 91.770(1)(c). The legislature used the words "applicable law," rather than simply "law"; therefore, ORS 91.770(1)(c) does not encompass every statute that concerns water. The scope of "applicable law" is defined by the goals that the statute was intended to accomplish. Reading ORS 91.770(1) as a whole, we conclude that its purpose is to provide a minimum level of health and safety standards to protect tenants. We have previously construed "applicable law" in ORS 91.770(1) to include housing codes that apply to the particular dwelling. *L & M Investment Co. v. Morrison,* 44 Or App 309, 315, 605 P2d 1347, *rev den* 289 Or 275 (1980). ORS 537.130 concerns the appropriation of water; its focus is on the acquisition of a property right to use water, rather than on water quality. Because ORS 537.130 does not address health or safety, it is not an "applicable law" under ORS 91.770(1)(c). Consequently, landlords' failure to obtain a permit to divert water from the creek does not itself render the trailer unhabitable.

■    The water supply for the trailer, water diverted from the creek and bottled water, satisfied the express requirements of ORS 91.770(1). The creek water diversion system was "capable of producing hot and cold running water" and was "furnished to appropriate fixtures." Tenants argue that, although the creek water was suitable for bathing and washing clothes, it was not sufficient because it was not drinkable. Many of the habitability requirements of ORS 91.770(1), including the water supply requirement, are governed by "applicable law," including local building

codes. Accepting that, for this mobile home in this rural area, drinkable water is a requirement for habitability. The offer to supply bottled water, which tenants rejected, satisfied this requirement. The statute does not require that hot and cold running water and drinkable water come from the same fixtures. The combination of the creek water diversion system and the bottled water would satisfy ORS 91.770(1), because it could produce hot and cold running water for bathing and washing clothes and drinkable water.

■ ■  Tenants contend that the trial court erred in deciding that landlords did not violate ORS 91.805(1), which provides that a tenant may recover damages if "the landlord deliberately refuses or is grossly negligent in failing to supply any essential service * * *." The term "essential service" is not defined in the statute. However, the term is more limited than the habitability requirements of ORS 91.770(1), and whether a particular habitability requirement is an essential service must be determined on the facts of each case. *L & M Investment Co. v. Morrison,* 286 Or 397, 403-04, 594 P2d 1238 (1979). We assume that drinkable water is an essential service in this mobile home, but here landlords neither deliberately refused nor were grossly negligent in failing to provide it. On at least two occasions, landlords offered to have a company or a friend deliver bottled water to the trailer. Tenants refused those offers for personal reasons and decided to haul their own bottled water. Thus, substantial evidence supports the trial court's decision that landlords did not violate ORS 91.805(1).

■  Tenants also contend that the trial court erred in deciding that landlords did not engage in retaliatory conduct prohibited by ORS 91.865, which provides, in part:

"(1)  Except as provided in this section, a landlord may not retaliate by * * * *bringing or threatening to bring an action for possession* after:

"* * * * *

"(b)  The tenant has complained to the landlord of a violation under ORS 91.770, * * *." (Emphasis supplied.)

Tenants argue that landlords' letter of September 16, 1980, notifying tenants that their tenancy would terminate

October 20, constituted a threat to bring an action for possession. We do not agree. Under ORS 91.855(2),[2] a landlord may terminate a month-to-month tenancy by giving the tenant at least 30 days written notice. The September 16 letter was merely an exercise of their right under ORS 91.855(2). Tenants ignored this letter and continued to possess the trailer until they voluntarily moved out on January 15, 1981. There is no evidence that landlords ever threatened to bring an action for possession of the trailer. Moreover, landlords testified as to their non-retaliatory reasons for sending the letter. The trial court was entitled to believe that explanation.

Affirmed.

---

[2] ORS 91.855(2) provides, in part:

"The landlord or the tenant may terminate a month-to-month tenancy by giving to the other, at any time during the tenancy, not less than 30 days' notice in writing prior to the date designated in the notice for the termination of the tenancy. * * *"